

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 29, 2020

**By ECF**

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:    *United States v. John Depeyster*, **19 Cr. 253 (GHW)**

Dear Judge Woods:

    The Government respectfully submits this letter in advance of sentencing in this matter, which is currently scheduled for July 13, 2020, at 3:30 P.M.  For the reasons explained below, the Government maintains that a sentence within the applicable U.S. Sentencing Guidelines range (the "U.S.S.G" or "Guidelines"), including an enhancement for obstruction of justice, of 33 to 41 months' imprisonment would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

    **A.  Relevant Background**

    The defendant was arrested on or about December 14, 2020, pursuant to a Complaint charging him with failing to register as a sex offender.  (*See* ECF No. 1.)  On or about April 10, 2019, an Indictment charging the same offense was filed in one count.  (*See* ECF No. 16.)  On or about October 29, 2019, the defendant moved to dismiss the Indictment.  (ECF Nos. 47–48.)  The Court denied that motion on or about December 5, 2019, and thereafter the defendant proceeded to trial, which was held from February 3, 2020, to February 6, 2020.  (*See* ECF Nos. 87, 89, 91, 93 (Trial Tr. from Feb. 3, 2020, through Feb. 6, 2020, and hereinafter collectively, "Tr.").)

    **1.  Offense Conduct**

    On or about October 9, 2007, the defendant was convicted in Kings County Supreme Court of two counts of sexual abuse in the first degree, in violation of N.Y. Penal Law § 130.65.  (PSR ¶ 6.)[1]  On or about October 22, 2007, he was sentenced to five years' imprisonment as a result of those convictions.  (*Id.*)  The offense underlying those charges stemmed from a forcible assault on a young woman in Brooklyn, and as a result of his convictions the defendant was required to register as a sex offender under both the federal Sex Offender Registration and Notification Act

---

[1] References to "PSR" refer to the Revised Final Presentence Report issued by the U.S. Probation Office ("Probation") on or about May 28, 2020.  (ECF No. 100.)

("SORNA") and the laws of any states where he lived and worked.  The defendant registered with the New York State Sex Offender Registry ("NYSOR") as required on or about December 22, 2010, while still in prison serving his state sentence, by completing an NYSOR registration form. (*Id.* ¶ 8.)  Among other things, that form required the defendant to acknowledge in writing that he understood he "ha[d] a duty to register" and that those "duties were explained to [him]."  (*Id.*)  The defendant was designated a Level Two, "sexually violent offender," under New York law, and thus was required to register as a sex offender for life.  (*Id.* ¶ 7.)

As a Level Two sex offender, the defendant is required to review and sign an annual address verification form.  (*Id.* ¶ 9.)  New York's Department of Criminal Justice Services ("DCJS"), which oversees the NYSOR, mails such forms annually to sex offenders required to complete the forms at the address on file for each offender. (*Id.*)  By law, sex offenders – including the defendant – must sign and return the annual address verification form within ten days. (*Id.* ¶¶ 9–10.)  Further, during the year, the defendant also "[m]ust notify DCJS in writing of any change of home address no later than 10 days after [he] move[s]," and "should [he] move out of NYS [he] must abide by the statutory registration requirements in that jurisdiction."  (*Id.* ¶ 11.)

As of November 15, 2018, the registered address the defendant had provided to the NYSOR database was 781 East 135th Street, Bronx, New York 10454, which is a men's shelter in the Bronx (the "Bronx Address").  (*Id.* ¶ 9.)  From approximately 2011 through approximately 2016, the defendant completed multiple NYSOR change of address forms to update his address, and he returned several signed annual NYSOR address verification forms as required.  (*Id.* ¶ 13.)  But then he stopped.  In or about December 2017, DCJS mailed an annual address verification form to the defendant at the Bronx Address, but he failed to sign and return the form as required under state law.  (*Id.* ¶ 14.)  The defendant never again confirmed or updated his address until he was arrested in or about December 2018.

## 2.  Evidence at Trial

A jury trial in this matter began on February 3, 2020.  Evidence adduced at trial showed that, from approximately December 2017 through November 2018, the defendant was residing in New Jersey – first, with a now ex-girlfriend at an apartment building in Newark, New Jersey, on Martin Luther King Boulevard (the "MLK Address"); and second, thereafter with his current girlfriend at another apartment on South 7th Street in Newark (the "Seventh Street Address").  (*Id.* ¶¶ 16–25, 36–40.)  Despite no longer residing at the Bronx Address, however, the defendant never updated his address in New York, nor did he register as a sex offender in New Jersey.  (*Id.* ¶¶ 26–27.)  The defendant was convicted of the sole charge in the Indictment on February 6, 2020.  (*See* ECF No. 83.)

## 3.  Probation's Guidelines Calculation

On May 28, 2020, Probation issued the defendant's final PSR.  (*See* ECF No. 100.)  The PSR calculates a total adjusted offense level of 16, a criminal history category of III, and a resulting Guidelines range of 27 to 33 months' imprisonment.  (*See* PSR ¶¶ 45–54, 57–63, 92.)  The Government agrees with Probation's calculation, with one exception.

On May 10, 2020, the Government informed Probation that it believed the defendant should receive a Guidelines enhancement for obstruction of justice.[2]  *See* U.S.S.G. § 3C1.1; *see also United States v. Ben-Shimon*, 249 F.3d 98, 102 (2d Cir. 2001) (quoting *United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997)) (explaining that "an enhancement for obstruction of justice based on perjured testimony" may be imposed if the a defendant "1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter").  Correctly noting that such an enhancement requires findings to be entered on the record, Probation left the question to the sound discretion of this Court.  (PSR at 22.)

## B.  Discussion

### 1.  Applicable Law

As the Court is aware, the Guidelines continue to provide important guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.  *Id.* at 49.  After that calculation, the Court considers the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need adequately to deter criminal conduct and promote respect for the law.  *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B)  to afford adequate deterrence to criminal conduct;

> (C)  to protect the public from further crimes of the defendant; and

---

[2] The defendant argues that the Government's arguments concerning the obstruction of justice enhancement are "untimely."  (ECF No. 101 at 9.)  While the Government's objection was not communicated to Probation in connection with the draft PSR received on April 6, 2020, the Government objected within ten days of receiving the final PSR on April 30, 2020.  (*See* ECF No. 100.)  And the Government's notice to Probation caused no prejudice to the defendant because, among other reasons, (*i*) the Government's objection concerns the applicability of a Guidelines enhancement rather than facts contained in the PSR; (*ii*) Probation does not make a determination as to whether that enhancement applies; (*iii*) the defendant was not otherwise entitled to credit for acceptance of responsibility; (*iv*) Probation's revised PSR was issued more than a month before sentencing; (*v*) whether the enhancement is applied cannot be determined until sentencing; and (*vi*) in any event, objections to a Guidelines calculation also may be raised at sentencing.  *See, e.g.*, *United States v. Rodriguez*, 943 F.2d 215, 216 (2d Cir. 1991).

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). To the extent a court imposes a sentence outside the range recommended by the Guidelines, that court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) (quoting *Gall*, 552 U.S. at 46).

## 2. The Court Should Apply the Guidelines Enhancement for Obstruction of Justice

As noted above, Probation left the question of whether to apply the Guidelines enhancement for obstruction of justice to the sound discretion of the Court. (PSR at 22.) For the reasons explained more fully below, the Government believes that the enhancement is warranted in light of trial testimony offered by the defendant that appears to be false and was not credited by the jury. The defendant does not believe that the enhancement should be applied. (*See* ECF No. 101 at 9.)

"In this Circuit, an enhancement for obstruction of justice based on perjured testimony may be imposed only where the sentencing court finds 'that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter.'" *Ben-Shimon*, 249 F.3d at 102 (quoting *Zagari*, 111 F.3d at 329). A defendant possesses a "specific intent to commit perjury . . . when . . . testifying under oath . . . [he] gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Thompson*, 808 F.3d 190, 196 (2d Cir. 2015) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). "In determining whether an enhancement for obstruction of justice is required, it is sufficient if the district court 'makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury,' but 'it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding.'" *Ben-Shimon*, 249 F.3d at 102 (quoting *Dunnigan*, 507 U.S. at 94–95). All of the requisite elements are satisfied here.

The defendant intentionally gave false testimony as to material factual matters when he took the stand at trial. For example, the defendant offered false testimony with respect to the following:

- The defendant testified, in relevant part, that he was "aware of the fact that I have to give SOMU my updated information, so that's why I gave them the 781 as my address, because that's where – I'm homeless, and that's where I

resided."[3]  (Tr. at 444:12–16.)  As Investigative Analyst Reginald Donaldson testified and cell site data introduced at trial showed, however, the defendant does not appear to have been in the Bronx during much of 2017 and 2018.  (*Id.* at 357:14–17; 360:1–4; *see also* Gov't. Ex. 417 at 7–14.)  And as the defendant later admitted, that is not the address listed on his driver's license, nor is it the address he provided to law enforcement when arrested in July 2018.  (*Id.* at 487:6–488:2.)

- The defendant also testified, in relevant part,  that "[o]n nights when I would arrive at the shelter, sometimes they wouldn't have a bed for me, so I would either . . . have to sit in a chair overnight, or they would tell me to just come back the next day because they would not be able to assign me a bed."  (Tr. at 445:9–13.)  But Gilbert Soto, the Program Director at the men's shelter in the Bronx, testified that the process for admitting residents to the shelter and determining who was in the building each evening was very different than that described by the defendant.  (*See id.* at 202:16–204.)

- Regarding his residence at the MLK Address with his ex-girlfriend, the defendant testified, in relevant part, "She's my girlfriend.   Sometimes she would say, hey, you know, can you come stay with me.  And I didn't see nothing wrong with staying with her.  It was just I would go stay with her sometimes." (Tr. at 446:8 –11.) However, Aja Greene, a security officer at the MLK Address testified that she saw the defendant almost every day, five days per week, for several months.  (*Id.* at 219:9–220:12.)  Indeed, based on those observations and the times of her shifts, Ms. Greene concluded that "[the defendant] was living there."  (*Id.* at 220:16–18.)   And the defendant eventually received a notice threatening to evict him from that address.  (*See* Gov't. Ex. 601; Tr. at 483:19–484:8.)

- With respect to his residing at the Seventh Street Address and his relationship with his current girlfriend, the defendant testified, in relevant part, that "[i]t wasn't established between us that you're going live here or whatever, you know.  Being that she knew that I did certain, you know, odd jobs in Jersey, she gave me a key to enter in the event that she was at work or whatever."  (Tr. 447:9–13.)  However, as the evidence at trial showed, the defendant was present at the Seventh Avenue address almost every day from October 12, 2018, through November 5, 2018.  (*Id.* at 297:4–19; *see also* Gov't Ex. 819.)  And the defendant's current girlfriend confirmed that he stayed at the Seventh Avenue Address at least three times a week for several months.  (Tr. at 424:6–425:7.)

- When asked, "Why didn't you fill out a change of address form and include New Jersey as a residence?" the defendant responded, "Because I didn't live in New Jersey."   (Tr. at 454:5–10.)   But, as already noted above, both Ms.

---

[3] As the Court may recall, "SOMU" refers to the New York Police Department's Sex Offender Monitoring Unit, which monitors registered sex offenders in the five boroughs of New York City.

Greene's testimony regarding the defendant's presence at the MLK Address and the defendant's girlfriend's testimony regarding his living at the Seventh Avenue Address show that the defendant did reside in New Jersey for substantial periods. (*Id.* at 219:9–220:12, 424:6–425:7.) That the defendant spent significant time in New Jersey during the relevant period was further confirmed by cell site data, along with Investigative Analyst Donaldson's testimony regarding those data. (*See* Gov't. Ex. 417 at 7–14.)

- The defendant also testified that he spent the night at his mother's house or his children's mother's house whenever he was unable to get a bed at the men's shelter in the Bronx. (*See, e.g.*, Tr. at 471:8–19.) But the defendant also claimed that he only spent the night at those locations "[o]ccasionally a few days," and that "it wasn't a long period of time." (*Id.* at 471:14–16.) Yet as shown by shelter records and the testimony of Mr. Soto, the defendant spent approximately two weeks at the shelter during all of 2017 and 2018. (Gov't. Ex. 301; Tr. at 209:22–210:4.) As a result, the defendant's testimony that he only infrequently stayed at other locations is contradicted by other evidence.

In short, the defendant testified falsely regarding a number of factual matters pertaining to where and when he physically resided at locations in New Jersey, which was directly material to his guilt or innocence of the charged offense. Nor were these the only instances in which the defendant's testimony contradicted the evidence; for example, the defendant insisted that he filed certain registration documents pertaining to his address, when neither he nor the relevant agencies had any record of such documents having been filed. (*See* Tr. at 478:23–479:3; 481:16–19.) The defendant thus offered false testimony under oath on both direct and cross-examination, in an effort to convince the jury that it should find him not guilty of the charged offense.

In response, the defendant argues that he "did not testify with the intent to give false testimony," and instead merely offered "his belief as to where he lived and where he resided and what his status was with respect to homelessness." (ECF No. 101 at 9.) But the truth or falsity of the defendant's purported belief that he was not a "resident" of New Jersey is irrelevant. Here, the Government seeks to apply the Guidelines enhancement for obstruction of justice because the defendant testified falsely regarding *facts* separate and apart from any subjective belief as to residency, such as whether and when the defendant was physically staying or sleeping at various locations. Substantial evidence offered at trial flatly contradicted the testimony offered by the defendant with regard to those factual matters, and it shows that the defendant "g[ave] false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Thompson*, 808 F.3d at 196 (quoting *Dunnigan*, 507 U.S. at 94). As such, the two-level enhancement for obstruction of justice is appropriate.

Applying that enhancement, the only difference between Probation's calculation and the Government's proposed calculation is a two-level increase in the total adjusted offense level from 16 to 18. (*See* U.S.S.G. § 3C1.1.) Based on that increased offense level and a criminal history category of III, the resulting Guidelines range is 33 to 41 months' imprisonment.

### 3. A Sentence Within the Calculated Guidelines Range Is Reasonable and Appropriate

The Government respectfully submits that a sentence within the Government-calculated Guidelines range of 33 to 41 months' imprisonment is sufficient, but not greater than necessary, to comply with the purposes of sentencing. All of the factors identified above, including the need to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to protect the public from further crimes of the defendant, and to afford adequate deterrence to this defendant and other similarly situated individuals, *see* 18 U.S.C. § 3553(a)(2)(A)–(C), weigh in favor of a Guidelines sentence.

*First*, a sentence within the calculated Guidelines range is necessary to reflect the seriousness of this defendant's offense and to provide just punishment for that offense. *See* 18 U.S.C. § 3553(a)(2)(A). Congress established SORNA to ensure that governmental authorities and the public could be aware of sexual offenders who lived or worked in their neighborhoods. While SORNA establishes a regulatory regime that applies to a wide range of offenders, there can be no question that the defendant's underlying offense requiring him to register under SORNA is extremely serious and align directly with the concerns motivating SORNA's enactment.

While the defendant has repeatedly downplayed the seriousness of his underlying offense (*see, e.g.*, Tr. at 62:13–14),[4] that offense involved the forcible and aggressive sexual touching of another. It was a gravely serious crime that caused the defendant to be designated a "sexually violent offender" under New York State law, and – as Probation calculated in the PSR – it rendered the defendant a Tier III offender under SORNA. In light of his underlying offense and the important policies motivating the defendant's requirement to register and update his registration, the defendant's disregard and evasion of his registration requirements for an extended period warrants a sentence within the calculated Guidelines range.

*Second*, a sentence within the calculated Guidelines range is necessary to protect the public from further crimes of the defendant, and to afford adequate deterrence. The defendant's failure to register and update his registration as required by law evidences his belief that he can choose whether and when generally applicable laws apply to him. Indeed, at trial and in his sentencing submission to this Court, the defendant continues his attempts to justify his actions by claiming that he simply did not believe that he was residing in New Jersey. (*See, e.g.*, Tr. 454:5–10.) The jury did not credit those claims and, as noted above, they appear to be continuing efforts to excuse or minimize the defendant's crime. A sentence within the calculated Guidelines will appropriately reflect the severity of the defendant's offense, and ensure that he complies with his continuing obligations under SORNA so that the public remains informed of his sex offender status and current address as the law requires.

*Third*, a sentence within the calculated Guidelines range is necessary to provide general

---

[4] As the Court is aware, the Government did not offer evidence of the nature of the underlying offense during trial in light of the Court's *in limine* ruling excluding such evidence. Nevertheless, defense counsel characterized the defendant's underlying offense during opening statements. (Tr. at 62:12–14.)

deterrence to others similarly situated. SORNA and state sex offender registration regimes are intended to advance public safety and were enacted as a result of the considered judgment of Congress and other elected bodies. And within the structure established by SORNA, this defendant's violation is serious; he is a Tier III offender who avoided statutory registration for a significant period of time. By doing so, the defendant effectively absented himself from state and federal sex offender monitoring programs, frustrating one of the central aims of SORNA's registration framework. *See, e.g., Carr v. United States*, 560 U.S. 438 (2010). Adequately addressing such violations is necessary to deter others subject to SORNA's requirements from similarly disregarding the law. And in this case in particular, a Guidelines sentence also is appropriate to emphasize that conditioning one's compliance with SORNA's registration requirements on subjective beliefs as to residency – regardless of where one is actually living and sleeping on an habitual basis – may result in serious consequences.

### 4. The Defendant's Arguments Do Not Warrant a Time Served Sentence

None of the defendant's arguments warrant a time served sentence.[5] In his submission, the defendant argues that he should receive a non-Guidelines sentence because he had a difficult childhood, limited education, and because other sex offenders have received non-Guidelines sentences for failing to register. (*See* ECF No. 101 at 2–4, 10–11.) Given that even the defendant has admitted that he understood his registration obligations, however, arguments regarding his education are unpersuasive. Moreover, although the defendant may have had a difficult upbringing, his own submission emphasizes that he currently has "strong family bonds" with relatives who "ha[ve] stood by him." (*Id.* at 4.) And even if other sex offenders may have received non-Guidelines sentences in other cases, that does not mean that dispensing with the Guidelines is also appropriate in this case.

The defendant also suggests the fact that he is "currently registered now" is evidence that "has every intention of registering in the future regardless of his own belief as to whether he is a resident of New Jersey or any other state." (ECF No. 101 at 10.) That argument is unconvincing. Prior to committing this offense, the defendant was required to register and update his registration to reflect the truth about he was residing, regardless of any subjective "belief" as to whether he really should be considered a "resident" of where he was living. *See* 34 U.S.C. § 20914(a)(3)

---

[5] The defendant suggests that he should be given a non-incarceratory sentence because he has been diagnosed with "borderline diabetes" and "high blood pressure" not requiring medication, and therefore is at greater risk with respect to COVID-19. (*See* PSR ¶ 76; ECF No. 101 at 7–9.) It is not clear whether Probation has confirmed either diagnosis based on medical records, as opposed to the defendant's own reporting. (*See* PSR ¶ 76.) To the extent the defendant suffers from those conditions, the Government agrees that diabetes is an increased risk factor and comorbidity with COVID-19. *See, e.g., People of Any Age with Underlying Medical Conditions*, Centers for Disease Control, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. The Government also acknowledges that pulmonary hypertension (as opposed to regular hypertension or high blood pressure) is an increased risk factor, *see id.*, but the defendant does not appear to allege that he suffers from that condition. In any event, the Court can address any such issues by delaying the date on which the defendant is ordered to report to begin serving his sentence, rather than reducing an otherwise appropriate sentence.

(requiring that a sex offender provide "[t]he address of *each residence* at which the sex offender *resides or will reside*") (emphasis added).  He did not.  And the defendant also omits that the Government required as a condition of his release on bail that he update his sex offender registration (*see* ECF No. 7); thus, it is equally likely that the defendant's registration is current because he quickly would be detained if it were not.

The defendant's continued refusal to accept responsibility for his offense is troubling.  Even in his sentencing submission, the defendant continues to minimize his conduct – arguing, among other things, that his failure to register was inconsequential as "a non-violent offense" and a simple mistake as to his "technical status" because he believed himself to "be technically homeless."  (ECF No. 101 at 7.)  That perspective is disconcerting, because it suggests the defendant still does not appreciate the seriousness of his conduct.  And in any event, it obscures the truth.  As discussed above, the defendant claimed at trial that he was living at a shelter, but the evidence showed that he was primarily living at the homes of girlfriends, ex-girlfriends, and his mother.  Similarly, the defendant claims that "[t]his case was not about a lack of respect for the law, but an insistence that [the defendant] did not 'live' in New Jersey and did not believe he had to register there at the time he was arrested," in part because "[c]ounsel was convinced that [the defendant] truly did not consider himself a New Jersey resident at the time," and "considered himself a New Yorker" because "[h]is license was from New York" and "his mail was received in New York."[6]  (*Id.* at 6.)  But such semantic distinctions are unavailing when a sex offender, like the defendant, is spending the majority of his time living and sleeping at addresses other than those provided to the relevant sex offender registry, as required by law.

### C.  Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant within the calculated Guidelines range of 33 to 41 months'

---

[6] Notably, the defendant omits that while "[h]is license was from New York" and "his mail was received in New York," neither of those addresses – which were different both from the men's shelter in the Bronx and from each other – were provided as current registered addresses to the NYSOR.  (ECF No. 101 at 6.)

imprisonment, as such a sentence would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Respectfully submitted,

AUDREY L. STRAUSS
Acting United States Attorney
Southern District of New York

By: *Jarrod L. Schaeffer*
   Jarrod L. Schaeffer
   Assistant United States Attorney
   Tel: (212) 637-2270


cc:    Inga Parsons, Esq.  (via ECF)